USDC- BALTIMORE
'25 OCT 15 PM3:27

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| OBED NORMAN | Case No. JRR 25-CV-3414 |
| Plaintiff PRO SE | |
| in his PERSONAL capacity as lead collaborative PI | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; | |
| DEPARTMENT OF GOVERNMENT EFFICIENCY | |
| AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; | |
| NATIONAL SCIENCE FOUNDATION; | |
| BRIAN STONE, in his official capacity as Acting Director of the NSF; | |
| LEE ZIA, Deputy Division Director NSF, Division of Undergraduate Education; | |
| LEAH MCALISTER-SHIELDS, Cognizant Program Officer, NSF; Division of Undergraduate Education | |
| JAMES L. MOORE, III, NSF, Director of the Directorate for Education and Human Resources. | |

HD

Rcv'd by: ___AR___

# TABLE OF CONTENTS

                                                                                     **Page**

INTRODUCTION ................................................................................................ 3

JURISDICTION AND VENUE ......................................................................... 11

THE PARTIES ................................................................................................. 11

    A.    Plaintiffs ................................................................................. 11

    B.    Defendants ............................................................................... 11

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ............................. 12

I.     Plaintiff Dr. Obed Norman has, through decades of federal funding, made a significant contribution to research that benefits the public and effectuates NSF priorities................................................................................................12

II.    Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction ...................................................................... 15

III.   President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants ...................................... 17

IV.   Agencies that Terminated/Returned Grants/Proposals Have Acted According to a Common Unlawful Pattern ....................................................................... 20

    A.    National Science Foundation ....................................................... 22

          1.    Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests ................................................................. 22

          2.    In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants ........................ 25

          3.    NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations ................................................... 29

               a.    Plaintiff Norman's Grant Terminations and Resulting Harm ..... 29

CLAIMS FOR RELIEF ..................................................................................... 29

COUNT I – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers ............................................................... 29

COUNT II – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of First Amendment (Content and Viewpoint Discrimination) ............ 30

COUNT III – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Fifth Amendment (Due Process / Void for Vagueness) ................... 33

COUNT IV – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations ............................................................................................ 34

COUNT V – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making ..................... 35

PRAYER FOR RELIEF ..................................................................................... 37

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff alleges for his Complaint against the below-named Defendants as follows

## **INTRODUCTION**

This case for declaratory and injunctive relief is brought by Pro Se Plaintiff Dr Obed Norman in his personal capacity. Plaintiff Norman is Principal Investigator (PI) of the collaborative NSF research grant proposals in this case and also the President and CEO of STEMLIFE. STEMLIFE is a Maryland Education Research nonprofit and the lead institution in the collaborative grant proposal (2500795 and 2500796) which is at issue in this case. Plaintiff Norman and his Iowa State University colleagues applied for a $5 million collaborative grant from the National Science Foundation (NSF) for a project titled REALSTEM on October 10, 2024. On June 14, 2025, eight months later, they were notified by email that their proposals were 'returned without review' for not meeting agency priorities. Press reports indicate our proposal was recommended for funding by NSF during the normal review process, but it was flagged and returned unfunded due to the fact that DOGE officials had inserted themselves into the normal review process and disqualified the proposals on discovering that the proposal contained words such as 'diversity'.

The evidence also shows that the proposal had in fact been reviewed by expert reviewers whose unanimous consensus -a unanimous consensus rarely achieved in NSF proposal reviews- was that our proposal was 'good' and 'competitive'. Our prayer of relief is that the court orders NSF to implement the recommendation for funding made to the Division of Grants and Awards (DGA) in the normal review process as ordered by the applicable court Temporary Restraining Order (TRO-NY-v-Trump-1.31.25.pdf).

In early **2025**, a federal court issued a TRO directing federal grant-making agencies, including the National Science Foundation, to "… not pause, freeze, impede, block, cancel or terminate … awards and obligations to provide federal financial aid.' In a Memo from the Treasury, all federal agencies were advised as follows: Proposal & Award Policies & Procedures Guide (PAPPG) (NSF 24-1) | NSF - National Science Foundation

> Federal agencies cannot pause, freeze, impede, block, cancel, or terminate
> any awards or obligations on the basis of the OMB Memo, or on the basis
> of the President's recently issued Executive Orders. This prohibition
> applies to all awards or obligations—not just those involving the Plaintiff
> States in the above-referenced case—and also applies to future assistance
> (not just current or existing awards or obligations).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Once a proposal has been forwarded to DGA, the DGA reviews the proposal for technical and budget compliance and issues the official award which creates a binding legal obligation on NSF. More importantly NSF has a legal obligation under the Administrative Procedures Act (APA) to conduct the entire proposal review process in a rational manner that is neither capricious nor arbitrary. These returns of proposals recommended for funding was in breach of the TRO as it occurred pursuant to Executive Orders or other directives of Defendant President Donald J. Trump, issued from January 20, 2025 to the present. The TRO (*New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50) expressly enjoined federal agency defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations," based on both the OMB directive and Executive Orders,  including the DEI and Gender Ideology Executive Orders.

These unjustified returns of meritorious proposals recommended for funding were implemented through Defendant Department of Government Efficiency ("DOGE") and then operationalized by myriad administrative agencies.

Plaintiff challenges these proposal returns and seek a declaration that they are unconstitutional and otherwise unlawful because they violate the bedrock constitutional principle of separation of powers; the First Amendment guarantee of free speech; the Fifth Amendment guarantee of due process; the Impoundment Control Act of 1974; statutes requiring agencies to fulfill congressionally defined missions; and the Administrative Procedure Act ("APA"). These proposal returns bypassed Congress, ignored or contradicted the purposes for which Congress created the granting agencies and had appropriated funds, and dispensed with the regular procedures and due process afforded grantees under the APA, in implementing the Trump Administration's political "cost-cutting" agenda and ideological purity campaign.

The process followed by NSF in this matter was not compliant with the TRO that was adjudicated by the court. NSF initially decided not to review certain proposals. The court then ordered that NSF review all submitted *proposals. This TRO gave proposal submitters the right to have their proposals reviewed and obligated NSF to use those revi*ews in evaluating the proposals. It is not normal NSF process to return proposals without or despite a review after a review has already been conducted. Our position is that in this matter NSF did not act in the normal way, as the court has ordered it should. It is inconceivable that the intention of the court was for NSF perfunctorily to complete the reviews and then

1    make decisions that did not take the reviews into consideration. NSF also cannot require a particular focus

2    for proposals and during the review disqualify proposals that are consistent with the focus originally

3    required by NSF. Proposers would have invested years of effort and extensive resources to comply with

4    specific solicitation requirements, just to be informed that their proposals are being returned because they

5    are following those exact solicitation requirements.

6        Defendants impeded the proposal reviews process by stopping the normal process. The normal process

7    was as follows: On being submitted, the proposals were inspected for compliance with the solicitations

8    requirements as well as the PAPPG regulations. after that, the proposals went through a rigorous review by

9    expert reviewers. At that point proposals that were not rated competitive are declined and the PI's are

10   informed of the declination. Proposals that were rated good and competitive are then forwarded to the NSF

11   division staff. At that point, the NSF staff decide which proposals they would recommend for funding.

12   Proposals recommended for funding would then be forward to the Division of Grants and Awards (DGA).

13   Only proposals recommended for funding are forwarded to the DGA. According to press sports it was at

14   this point that NSF stopped following the normal process. This was also the point at which the DOGE staff

15   impeded the process by removing the proposals from DGA and returning the proposals recommended for

16   funding to the principal investigators with the message that the proposals did not effectuate agency

17   priorities. This impeding of the normal proposal review process was clearly prohibited by the TRO.

18   Inserting the DOGE personnel into the process was a requirement of OMB directive 2025. Implementing

19   any OMB 2025 directive in the proposal review process was explicitly forbidden by the TRO. This

20   impeding of the proposal review process is sufficient ground for the court to grant plaintiff's request.

21   1.  Plaintiff seeks, for himself and others involved in the collaborative of which STEMLIFE is

22       the lead institution and he is the PI, an injunction that restores their lost funding, enjoins

23       further unlawful grant terminations or suspensions, and provides the grant extensions

24       necessary to enable them to effectively complete the work for which these grants were

25       approved. Plaintiff and his research team are suffering, or will imminently suffer, concrete

26       harm to their research, their careers, and their professional standing.

27   2.  Grants to researchers each year from federal agencies such as the National Science

28       Foundation, ranging from thousands to millions of dollars, fund the production of new

29       knowledge and fuel the development and deployment of discoveries useful to society.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

3. Federal grants have been key to the innovation that has consistently earned the United States world leadership in STEM research and innovation.

4. Before President Trump returned to office, federal agency grant-making proceeded under the authority of Congress, which created agencies through its constitutionally assigned exclusive legislative power, and appropriated taxpayer funds for specific public purposes that the agencies were tasked to execute. For decades, agencies carried out these statutory directives and observed due process in making, renewing, and (only seldom) terminating grants or returning proposals without review. They each adhered to their own grant regulations that were duly promulgated through notice and comment rulemaking under the APA and followed APA procedures when modifying such regulations.

5. As a corollary, on the rare occasions when agencies terminated grants or returned proposals without review, they did so pursuant to predictable, regularized processes; based such drastic steps on proper review and evaluation of grantees' and proposers' activities to assure compliance with the terms and purpose of the awarded grants; and took such drastic action only for reasons stated in applicable regulations.

6. All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to seize direct control of federal agencies by bypassing Congress and upending the statutory and regulatory system under which federal agencies have historically and legally operated.

7. On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of Executive Orders and other directives, commanded the federal agencies such as the NSF, to engage in actions to pause, freeze, impede, block, cancel, or terminate grants and proposals despite having been court-ordered in a TRO that NSF "… not pause, freeze, impede, block, cancel or terminate … awards and obligations to provide federal financial assistance to the states, and … not impede the states' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations and terms." NSF's actions in this case were in breach of all the stated requirements of the TRO.

8. Abrupt, wholesale, and unilateral termination of these grants and return of proposals has violated the Constitution's core principle of separation of powers and its guarantees of freedom of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

to withhold or redirect congressionally appropriated money; ignored statutory requirements that agencies fulfill their substantive missions and fund congressionally-specified activities; contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt, unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra vires* conduct.

9. Despite our repeated requests for the reasons why our proposal was returned, NSF has offered no explanation for its proffered reason. Communications made it clear that grants were being terminated and proposals returned to further Defendant Trump's political objectives, which included the elimination of research on "DEI" (diversity, equity, and inclusion), although the latter terms were not defined.

10. NSF returned proposals on a categorical, *en masse* basis, without individual review or regard to a project's merit, and without any semblance of due process. Our proposal was not returned because we were in violation of the terms of the published grant solicitation or strayed from the stated subject matter or purpose of the program. Such deficiencies could have been addressed in the normal and ordered course of grant-submission and review. To the contrary: these grant terminations were and are occurring, as their timing and reflection of the 2025 Executive Orders demonstrates, not because the research for which funding was approved had departed from its originally approved purpose, but because that purpose now offends the political agenda and ideological requirements of the Trump Administration.

11. Plaintiff does not seek an Order immunizing all proposals from ever being returned or changing agency grantmaking procedures as they existed prior to January 20, 2025. He does seek a return to the *status quo ante* of ordered grant processes, aligned with congressionally authorized purposes, and affording due process to grant recipients and proposers. This return to procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process and the APA, by federal agencies that defer not to unilateral Executive dictates but to congressional authority, is the essential relief Plaintiff seeks. Such relief has already been granted to plaintiffs in federal court in California and confirmed by the 9th Circuit Appellate court.

12. Examining similar unlawful executive branch conduct by Defendants Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the mass

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    termination of hundreds of thousands of federal employees, the United States District Court

2    (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary Injunction in *American*

3    *Federation of Government Employees, AFL-CIO v. Trump,* Case No. 25-cv-03698-51 (Dkt.

4    124):

5         Presidents may set policy priorities for the executive branch, and
6         agency heads may implement them. This much is undisputed. But
7         Congress creates federal agencies, funds them, and gives them duties
8         that—by statute—they must carry out. Agencies may not conduct
9         large-scale reorganizations and reductions in force in blatant
10        disregard of Congress' mandates, and a President may not initiate
11        large-scale executive branch reorganization without partnering with
12        Congress. For this reason, nine Presidents over the last one hundred
13        years have sought and obtained authority from Congress to
14        reorganize the executive branch. Other Presidents—including
15        President George W. Bush, President Obama, and President Trump
16        in his first term—asked Congress for agency reorganization authority
17        but did not receive it.

18

19   In denying Defendants' request for a stay of the preliminary injunction in that case, the 4th Circuit

20   affirmed the bedrock principles that administrative agencies are creatures of Congress, not the

21   President, and that "Congress has plenary control over the salary, duties, and even existence of

22   federal offices." *Am. Fed'n of Gov't Emps. v. Trump,* —F.4th— (May 30, 2025) (citing *Free Enter.*

23   *Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,500 (2010)).

24       13.    Here, Defendants have engaged in the same unprecedented and unlawful overreach

25   described and enjoined above, in the context of mass terminations of research grants and return

26   of grant proposals duly recommended for funding. Their playbook involves a trifecta of illegal

27   moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives

28   that usurped congressional authority and unlawfully discriminated against disfavored speech.

29   Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt

30   Trump's policies as their own by terminating scores of already awarded grants or proposals

31   recommended for funding, notwithstanding that DOGE (whose own status as a governmental

32   entity remains unclear) lacks legal authority to supervise administrative agencies. Third, and

33   finally, Federal Agency Defendants terminated grants and returned proposals on the stated basis

34   that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders

35   and directives, when in fact the grants' inconsistency was with *executive preferences*. In so

36   doing, agencies violated their statutory mandates, the APA, the constitutional Due Process

37   guarantee, and their own regulations.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

14. Plaintiff and his associates have suffered concrete financial, professional, and other harms from NSF's unilateral return of proposals to which they have already dedicated years of time and effort; for research upon which they have staked careers and reputations; and for work with research teams through which they endeavored to train a next generation. Without judicial relief, these researchers will suffer irreparable injury to their research and their careers.

15.   Equally as profoundly, these terminations have impaired and will impair the public-serving research mission of the nation and the concern for public welfare that undergirds it.

16.   All of the Defendants' conduct, and the Plaintiffs' resulting harm, proceeds directly from Defendant Trump's determination to erase the constitutional boundaries that separate the branches of government and that assign defined powers to each. Specifically, the illegal return of federal grant proposals that is the subject of this action proceeds from Defendant Trump's efforts to arrogate the law-making powers of Congress to himself.

17.   Plaintiff will continue to suffer harm on an ongoing basis and will experience increasing and irreparable harm absent the declaratory and injunctive relief here sought.

18. NSF research proposals are expected to adhere to and comply strictly with the directives set out in NSF's Proposal & Award Policies & Procedures Guide (PAPPG) and the solicitation of the funding opportunity. In order to comply with APA requirements of reasonable and rational decision-making, NSF therefore should judge proposals only under the rules set out in the PAPPG and the requirements in the solicitation of that particular competition. It is clearly unreasonable, after the proposals have been submitted, for NSF to add new rules under which the submitted proposals will be judged as that would clearly constitute an unfair and inappropriate decision-making process in breach of the APA requirements for agency decision making to be reasonable and not arbitrary and capricious. The DOGE team entered the review of our proposal at the stage when the proposals had already been reviewed and recommended for funding. The timing of this new review by DOGE is unreasonable on its face in addition to being in breach of the TRO which required NSF to use its normal procedures in evaluating grant proposals. It is also unreasonable that the new review by DOGE constituted an

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    expectation that proposals now be reviewed under agency priorities that were not spelled out

2    before the proposals were submitted. The decision-making by DOGE therefore does not meet

3    the standard of reasonable decision making that is required under the APA statute. In the

4    declaratory injunction we seek, we respectfully request that the court articulate this definition

5    of reasonable decision making. Both the sequence of the review process events and

6    introduction of new expectations are at odds with the APA requirements of reasonable

7    decision-making.

8    19. In 2025 two cases have been decided regarding decision making by NSF. The first case was

9    about the decisions NSF made to terminate grants which they had previously approved. This

10   present instance regards the NSF decisions to return proposals that earlier had been

11   recommended for funding. In the latter court ruling regarding the terminated awards, the

12   plaintiffs have prevailed and their awards have been reinstated at the various universities. This

13   plea is about the decisions that NSF has made regarding proposals which had been

14   recommended for funding, but then returned unfunded. In both instances, there were two

15   decisions made by NSF. There was an initial decision to award grants to various institutions.

16   Then there was a second decision in witch NSF decided to terminate those grants which had

17   been awarded earlier. This plea also involves two decisions made by NSF. The first decision

18   was to recommend Plaintiff's proposals for funding. Then there was a second decision in which

19   NSF decided to return the proposals without funding. The difference between the two decisions

20   in both of the cases was that one of the NSF decisions was in breach of the APA in that the

21   decision was arbitrary and capricious, while the other decision was in compliance with the

22   APA. In both cases, the plaintiffs merely requested the court to compel NSF to implement the

23   one decision that was in compliance with the APA. A court has already compelled NSF to

24   implement the decision to reinstate the awards that were illegally terminated. In this case,

25   Plaintiff's respectful request to the court is to compel NSF to implement the decision to

26   recommend the returned proposals for funding as was originally decided by NSF.

- 10 -

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and the Plaintiff is a US citizen resident of Baltimore, Maryland.

## THE PARTIES

**A.    Plaintiff**

23. Individual Plaintiff Dr Obed Norman is the Plaintiff PRO SE

Suing in his PERSONAL capacity as lead collaborative Principal Investigator (PI) and not as President of STEMLIFE. STEMLIFE is a Maryland Education Research nonprofit and the lead institution in the collaborative grant proposals (2500795 and 2500796) which are at issue in this case. Plaintiff Norman and his Iowa State University colleagues applied for a REALSTEM $5 million collaborative grant from the National Science Foundation (NSF) on October 10, 2024. Norman is a United States citizen and resident of Baltimore City, Maryland.

**B.    Defendants**

24. DONALD J. TRUMP, in his official capacity as President of the United States;
25. DEPARTMENT OF GOVERNMENT EFFICIENCY
26. AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency;
27. NATIONAL SCIENCE FOUNDATION;
28. BRIAN STONE, in his official capacity as Acting Director of the NSF;
29. LEE ZIA, in his official capacity as Deputy Division Director NSF, Division of Undergraduate Education;
30. LEAH MCALISTER-SHIELDS, in her official capacity as Cognizant Program Officer, NSF; Division of Undergraduate Education
31. JAMES L. MOORE, III, NSF, in his official capacity as Director of the Directorate for Education and Human Resources.

- 11 -

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

I. **Plaintiff Dr. Obed Norman has, through decades of federal funding, made a significant contribution to research that benefits the public and effectuates NSF priorities.**

II.    32. Norman has an extensive history with grant awards from the NSF. In 1998 PI Norman was awarded the Early Career NSF award, which is the most prestigious award in the NSF Science Education Division. With that early award, he tackled the important problem of the test score gap between white students and black students. In studying the test score gap, PI Norman extended his project to include not only the gap between white and black students but also the gap that exists between Asian and white students and the gap that exists between US-born STEM students and H1B visa applicant students. Kathleen McCartney, former Dean of the Harvard Graduate School of Education and past president of Smith College, stated the test score gap is the single most pressing problem in education. Noted Harvard sociologist Christopher Jencks said this problem needs urgent action and solution  because solving it is necessary and sufficient to reduce racial inequalities in education attainment and earnings. Some economic estimates are that solving this problem will add 760 billion dollars to the US economy yearly. Jencks said that this problem needs urgent solving but 'Unfortunately, we do not have a detailed blueprint for reducing the black-white test score gap, and neither does anyone else'. PI Norman had developed a solution for this problem with his Early Career NSF award through a tested intervention which has the potential to benefit all students in that it will eliminate all those gaps and at the same time elevate or enhance the academic performance of all students. The returned proposal submitted on October 5, 2024 is described by the NSF expert reviewers as follows:

'The project's intervention tool provides an innovative and tested

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

approach to address the "learning opportunity gap" between Black and White students, as demonstrated through the testing scores. • The elimination of 'high-stakes' tests in biology classes as part of the intervention tool, while still demonstrating academic achievement, has the potential to be used in other STEM education disciplines and institutions.

The success of the project's intervention tool model can be duplicated at other institutions, eventually increasing Black representation in the STEM teaching workforce and STEM careers in general. This study proposes implementing the study with potentially 60,000 participants and approximately 500 instructors participating by year five. If this works out, it will significantly strengthen the broader impact for instructors and students alike.

The project will be conducted at both HBCUs [Historically Black Colleges and Universities] and PWI [Predominantly White Institutions] education institutions'.

For the NSF and the nation, the return on investment in PI Norman's research has been significant. Out of his research an article on the test score gap in the prestigious *Journal of Research in Science Teaching* has been cited in just under 300 scholarly publications. An article on scientific literacy has been cited by a team of researchers from the University of Oxford in the United Kingdom, which in some rankings is considered the number one university in the world. PI Norman's publication on exploring hypotheses on learning has been requested by the University of Paris, the Sorbonne, for inclusion in their collection of important papers on the work of the celebrated French educator Jean Piaget. PI Norman has developed an intervention which has the potential to solve a problem that no one in education has been able to solve for over 70 years. According to the NSF website, proposals most likely to be funded are those that present 'different approaches to significant research and education questions, potential (with perhaps high risk) for transformational advances in a field, capacity building in a new and promising research area, or achievement of special program objectives'. It also states that Program Officers will consider NSF's current proposals and previously funded projects in making their funding recommendations. The expert reviewers of our returned proposal indicate that our proposal more than meets the stated review standards of NSF. The reviewers stated, in part:

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

'The broader impact of this project is based on an innovative and
tested approach to address the white-black learning opportunity gap
(LOG) in STEM education. By testing and evaluating an
intervention to reduce this gap, the project aims to significantly
improve academic outcomes for Black students. Also, increasing
Black representation in the teaching workforce can foster equity in
education and contribute to better academic outcomes for students,
while tackling the challenge of stereotypical threats, which in turn,
the improvement of Black student academic performance could lead
to higher college graduation rates and large economic benefits, such
as closing wage gaps and increasing mean earnings…. The broader
impacts of the proposal include a possible blueprint for eliminating
the national "achievement gap," which thus far still plagues STEM
education. The study also alludes to the benefits pertaining to
increasing the national economy by increasing the number of highly
educated workers in STEM fields.'

33. In challenge, we also assert that NSF has no basis for returning the proposal without review

on the grounds that the proposal does not effectuate NSF priorities. The NSF has a

Congressionally mandated focus on improving diversity in STEM fields. NSF is in clear

breach of that Congressional mandate when it rejects our proposal for focusing on

diversifying STEM. Congress has instructed in law that a 'core strategy' of NSF's work

must be to increase the participation of people who have historically been left out of STEM

occupations. Doing so is in the interest of national security and economic development.

Even the currently published NSF priorities state that NSF priority remains helping

underperforming students improve their STEM academic performance. That also is the

main goal of our proposal. The currently stated priority of NSF is that proposals that are

exclusively focused on one racial or ethnic group and excluding other ethnic groups are no

longer acceptable. While our proposal is focused on students from underrepresented

communities so that they can improve their academic performance, the submission makes it

clear on page 1 that the focus of this proposal is not exclusively on students from

underrepresented communities; it also has a focus on White students and on all students at

Historically Black Colleges and Universities (HBCUs) as well as at predominantly White

colleges. Also on page 1, the proposal states clearly that the main component of the

- 14 -

intervention that is elaborated in the proposal is the use of retrieval exercises, which have been shown to enhance the learning of students both from underrepresented communities and from non-underrepresented communities such as White students. The intervention is therefore not one that benefits only one group of students or an intervention that helps one group of students at the expense of any other group of students. The intervention is aimed at improving the academic STEM performance of all students, and no students are excluded from the intervention. STEMLIFE, the name of the nonprofit lead institution, stands for STEM Learning Improvement For Everyone. The goal of the intervention requires that the intervention be implemented with students from underrepresented communities and other students who do not fit that category, so we can determine whether the test score gap between these student groups is being reduced or eliminated as is the goal of the proposal.

Under the heading Sampling and Recruitment on page 13, the proposal states:

> 'The student population of interest will be primarily, but not exclusively, students from under-represented communities (SURC) taking introductory college STEM courses and teacher candidates preparing to take STEM teacher certification (e.g., PRAXIS). The study sample will be selected from HBCUs, as well as predominantly White institutions (PWIs), since 90% of students from underrepresented communities (SURC) attend PWI's

### III. Congress's Power of the Purse Makes Illegal the Return of Plaintiff's Proposal at the President's Direction After Iit Had Been Recommended for Funding to the DGA

34.    The partnership between the states and the federal government is a product of Congress's powers, and by design insulated from political winds in the executive branch. Congress has repeatedly emphasized the importance of federally funded research as critical to the strength and security of the nation and has used its powers to set research priorities and appropriate funds to federal agencies to carry out those priorities.

35.    Congress has the constitutional power to appropriate funds for such research and to create agencies necessary to implement federal policies. Article I vests Congress with the legislative power to create departments, agencies, and offices within the executive

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative

Powers herein granted shall be vested in a Congress of the United States.").

36.    Congress's legislative power includes "the establishment of offices... [and]

the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S.

Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or

have purpose without Congress's direction." (*See Nat'l Fed'n of Indep. Bus v. Dep't of Lab.,*

*OSHA*, 595 U.S. 109, 117 (2022)). Congress thus establishes executive agencies and crafts the

statutes that govern each agency's administration. (*See, e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16

U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42

U.S.C. § 7131 (Energy).

37.    Congress also holds the power of the federal purse. Indeed, Congress's

powers to set the policies of the nation are at their apex when it comes to spending money, as the

Constitution "exclusively grants the power of the purse to Congress, not the President." *City &*

*Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress makes its

priorities clear by appropriating funds to agencies to carry out specified activities.

38.    The Constitution requires the President, meanwhile, to "take Care that the

Laws be faithfully executed." U.S. Const., art. II, § 3. The "Take Care Clause" assures that

"Congress makes the laws and the President faithfully executes them." *Utility Air Reg. Grp. v.*

*Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). This includes ensuring the

appropriation of funds per Congress's direction.

39.    The executive branch has *no* constitutional authority to refuse to carry out

laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or

delay spending appropriated monies based on the President's own policy preferences. For nearly

two hundred years, it has been established that the Executive violates the Take Care Clause when

it ignores, refuses to execute, or purports to override statutes. *Kendall v. United States*, 37 U.S.

(12 Pet.) 524, 613 (1838).

40.    A President's Executive Order cannot override Congress's express

direction. The President "is without authority to set aside congressional legislation by

- 16 -

1    executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C.

2    Cir. 1999). Rather, the "President's power, if any, to issue [an] order must stem from

3    either an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v.*

4    *Sawyer*, 343 U.S. 579, 585 (1952).

5        41.    The President has no power to order the rescission of funds. If the

6    President wants funds rescinded, he may *ask* Congress to do so pursuant to the

7    Impoundment Control Act ("ICA"), 2 U.S.C. § 681 *et seq*. Under the ICA, the President

8    can "transmit to both Houses of Congress a special message specifying," among other

9    criteria, the amount of budget authority he proposes be rescinded, the reasons why it

10    should be rescinded, and the effect of the proposed rescission on the "objects, purposes,

11    and programs for which the budget authority is provided." *Id.* § 683(a). Unless

12    Congress passes a rescission bill that covers the President's request within 45 days,

13    however, the funds shall be made available. *Id.* § 683(b).

14        42.    Even under the ICA—which clearly states it cannot interfere with

15    the Constitutional separation of powers, § 681(1)—the President is constrained. His

16    requests for rescission cannot "supersede any provision of law which *requires* the

17    obligation of budget authority or the making of outlays." 2 U.S.C. § 681 (emphasis

18    added). Nor can the President request reductions of *already obligated* funds, including

19    grants. *See id.* § 683; Congressional Budget Office, *CBO Explains How It Estimates*

20    *Savings From Rescissions* (May 26, 2023), https://www.cbo.gov/publication/59209

21    (explaining a rescission will not impact funds that are obligated).

22        43.    In short, once Congress has allocated money for grants or directed

23    agencies to use funding to carry out research, the President cannot unilaterally refuse to

24    spend or to redirect such funds. Nor can agency leaders, substituting the President's

25    directives for Congress's, terminate without lawful cause grants that were awarded

26    pursuant to congressional directives. Such refusal to spend money appropriated by

27    Congress violates both the separation of powers and the Impoundment Control Act.

28    **IV.    President Trump Issues a Flurry of Executive Orders**
29    **and Creates DOGE, Unlawfully Directing Agencies to**
30    **Terminate Grants and Return Proposals Recommended**
31    **for Funding.**

44.    Beginning on Inauguration Day (January 20, 2025), Defendant Trump issued a number of broad directives through Executive Orders (EOs). These included demands on federal agencies to take action to comply with the President's agenda.

45.    In particular, Defendant Trump and his administration explicitly and implicitly called on federal agencies to "terminate" previously awarded grant funds and prevent funding of proposals recommended for funding. In so doing, the Administration did not comply with Congress's prior spending decisions and direction.

For example, Executive Order No. 14151, dated January 20, 2025 and titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law... all 'equity-related' grants or contracts" within 60 days. (Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical- and- wasteful-government-dei-programs-and-preferencing)

46.    EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," addresses purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."

47.    According to the Order, DOGE would be "dedicated to advancing the

- 18 -

President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, borne considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

48. On February 26, 2025, Defendant Trump doubled down. He issued EO No. 14222, "Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative."[31] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." This Order required federal agencies to review all existing grants with an eye toward termination:

> Each Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending
>
> to promote efficiency and advance the policies of my Administration. This process shall commence immediately and shall prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse. Each Agency Head shall complete this review within 30 days of the date of this order.

49. According to DOGE's self-described "Wall of Receipts," as of June 3, 2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in "savings."

50. Despite multiple successful legal challenges to President Trump's EOs and related directives,[33] Defendants have unlawfully terminated grants and prevented the funding of proposals recommended for funding.

51. This lawsuit arises because, in unilaterally blocking the funding of our proposal without lawful cause after it has been recommended for funding, Defendants are flouting constitutional limits on the Executive's authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

52. That these grant terminations and blocking of proposals recommended for funding violate the separation of powers became even clearer on May 28, 2025. Until then,

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE

2   will be led by "each and every member of the President's cabinet and the President himself, who

3   is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is

4   no longer any illusion that DOGE is more than a proxy for Defendant Trump and his priorities.

5   The White House reiterated that each Cabinet secretary would work with DOGE employees at

6   their agencies so that the "mission of DOGE will continue."[36] The DOGE Trojan Horse has been

7   welcomed inside the gates of the Federal Agency Defendant NSF, and the harms to the research

8   community and Plaintiffs thus will continue and very likely increase.

9        53.    In adopting, implementing, and enforcing Defendant Trump's "priorities"

10   to illegally terminate grants and block proposals recommended for funding, Defendants have

11   caused and will continue to cause significant concrete harm to Plaintiffs as well as the broader

12   public that benefits from  research, discovery, and inventions.

### V.    Agencies that Terminated Grants and Returned Proposals Recommended for Funding Have Acted According to a Common Unlawful Pattern

17        54.    On information and belief, all Federal Agencies including NSF Defendants

18   similarly and abruptly failed to continue grants pursuant to Congress's directives, instead

19   substituting Defendant Trump's agenda. In place of reasoned decision-making, the federal

20   agencies took direction not only from the flurry of EOs described herein, but in most instances

21   also took direction directly from DOGE staffers, who have no authority to direct or redirect

22   allocation of federal funds. Indeed, in other cases, the United States, per its Department of Justice

23   counsel, has on the record taken the position that Elon Musk—who helmed DOGE until

24   recently—did not occupy an "office," lacked a title conferring formal authority, and was thus

25   beyond judicial review or legal consequence.

26        55.    In terminating proposals already recommended for funding, Federal

27   Agency Defendant NSF acted recklessly in disregarding the law, failing to consider Plaintiff's

28   reliance and expectation interests, and failing to consider the harm resulting from immediately

29   stopping ongoing research studies. On average, it takes about three unsuccessful attempts before

30   proposers get their proposals funded by NSF. In our case it took us four attempts before we got

31   recommended for funding in 2025

- 20 -

56.   Moreover, the Federal Agency Defendant NSF conducted no proper review of grants, instead mass-terminating with form letters those grants they deemed (with no explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies cannot substitute the President's agenda for their congressionally imposed statutory mandates.

57.   This Complaint examines the errant grant practices at the NSF Agency that returned our proposal despite the proposal having been recommended for funding—and then describes how this same pattern played out within other each Federal Agencies, to the categorical and common detriment of the Plaintiff and his associates.

I.   Defendants' mass return of grant proposals recommended for funding was arbitrary and capricious for many reasons, including (but not limited to) the following:

a.   The Termination Notices do not provide a reasoned explanation for returned proposals. Rather, the letters sent across all agencies generally state that the proposal being returned no longer "effectuates" or is no longer "in alignment" with Agency priorities. That generic statement is not a reasoned explanation.

b.   Research proposals are recommended for funding only after a rigorous and objective application and review process that necessarily established that funded projects were meritorious and satisfied relevant criteria. Defendants have failed to provide any reason our proposal failed to satisfy applicable criteria. The reason that NSF cites for returning our proposal is false. The NSF statement that our proposal was being returned without review (RWR) was an outright falsehood. The proposal had been reviewed and found to be 'good and competitive' by all three expert reviewers. Nowhere in the PAPPG is allowance made for returning a proposal without review after the proposal had been reviewed. Under the Administrative Procedures Act (APA), NSF is bound by law to act in compliance with its own stated PAPPG. That false statement by NSF is therefore also in clear breach of the PAPPG. Our proposal was returned after a full review, which confirmed it met NSF priorities, the solicitation requirements, and standards for intellectual merit and broader impact. The expert reviews were preceded by an initial determination of compliance and appropriateness by NSF staff and

- 21 -

1    accompanied by further staff scrutiny for appropriateness and compliance during the expert

2    review stage. Proposals are not sent for expert review without prior and concurrent

3    determination by NSF staff that the proposals effectuate NSF priorities.

4                **1.**       **Congress Established the National Science Foundation to Promote**
5                        **Scientific Research on a Broad Scale to Advance the United States'**
6                        **National Interests**

7        58.    NSF was created after World War II when it became clear that federally

8    funded scientific research was key to the nation's national security interests. Describing it as an

9    Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare;

10   to secure the national defense; and for other purposes," Congress established NSF in 1950

11   through enacting the National Science Foundation Act of 1950 (the "Act"). Public Law 81-507

12   (codified at 42 U.S.C. § 1861 et seq.).

13       59.    The NSF's core function is making grants to fund innovative

14   scientific research. The NSF awards grants through an apolitical merit review process,

15   under which panels of disinterested scientific experts vet grant applications and make

16   award decisions. The NSF's merit review process is often referred to as the "gold

17   standard" of scientific review, and NSF- funded research has contributed to some of the

18   most important scientific advances of the past 70 years.

19       60.    The Act arose out of the growing awareness during World War II

20   that science was crucial to the Unites States' national interest and security, as science

21   was key to the Allied successes in the war. Indeed, during World War II, federal

22   government support of scientific research accelerated dramatically, and a growing

23   consensus emerged in favor of continuing government support of basic scientific

24   research after the end of the war.

25       61.    The NSF's statutorily defined mission "is to provide Federal support

26   for basic scientific and engineering research, and to be a primary contributor to

27   mathematics, science, and engineering education at academic institutions in the United

28   States." 42 U.S.C. § 1862k(a)(6)(A).

29       62.    The Act establishes a series of core "functions" for the NSF. Chief

30   among them, the Act authorizes and directs the NSF to "initiate and support basic

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

scientific research in the mathematical, physical, medical, biological, engineering, and other sciences," as well as "specific scientific research activities in connection with matters relating to the national defense.

63. The Act also directs the NSF to provide "grants, loans, and other forms of assistance" to support scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences."

64. The Act has been amended at various times since 1950. Since at least 1980, Congress has recognized that for the United States to maintain its competitive edge, it would need to encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Congress consequently declared that "the highest quality science over the long-term requires substantial support, from currently available research and education funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics, to have equal opportunity in education, training, and employment in scientific and technical fields, and thereby to promote scientific literacy and the full use of the human resources of the Nation in science and technology. Pub. L. 96-516 § 32.

In other words, Congress has consistently acted to consciously *expand* STEM access rather than to narrow it, by affirmative outreach to groups not traditionally invited or encouraged to contribute to STEM initiatives.

65. One such act was the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's statutory commitment to making the United States a leader in STEM fields, and it set as long-term goals for the NSF to provide leadership to:

a. enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology;

- 23 -

b.    promote the discovery, integration, dissemination, and application of new knowledge in service to society; and

c.    achieve excellence in United States science, mathematics, engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

66.    Pursuant to these congressional directives, much of the NSF-funded research at universities has, for decades, supported the participation in STEM fields by women, minorities, and people with disabilities.

67.    Notably, the 1998 Amendment sets forth several "core strategies" for achieving the above goals, which include a focus on ensuring diversity in entrants to STEM fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

68.    The Act was again amended in 2007 as part of the "America COMPETES Act," which sought to bolster the competitiveness of the United States in scientific research and innovation. It instructed the NSF to "give priority" in granting awards to research activities "that can be expected to make contributions in physical or natural science, technology, engineering, social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and security in the United States." 42 U.S.C. § 1862o-5(b).

69.    The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-term grants in response to specific proposals from researchers and research organizations. The NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

70.    The NSF employs a merit review process in which reviews of grant applications are carried out by panels of independent scientists, engineers, and educators who are experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers judge grant applications for both "intellectual merit" and "broader societal impact."

71.    NSF grants are highly competitive and prestigious, and its pre-January 20,

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    2025 merit review process is often credited for the profound success of the NSF throughout its

2    history. Indeed, it is no exaggeration to say that the world as we know it today would not exist.

   2.    **In Response to Trump Administration Directives, NSF Improperly
         Changed Priorities, Canceled Existing Grants, and Returned
         Proposals Recommended for Funding.**

72.    The foregoing paragraphs describe the NSF as it existed and

functioned through the decades, from its original founding until January 20, 2025.

73.    The NSF is now facing an existential threat: the Trump

Administration has negated the NSF's core grant-making function by unilaterally,

arbitrarily, and illegally terminating billions of dollars in lawfully awarded scientific

grants that the Administration views (often mistakenly) as having some connection to

diversity, equity, and inclusion (most broadly defined), as well as other subjects the

Trump Administration dislikes, such as climate change, vaccines, HIV/AIDS, and

COVID-19.

74.    At Defendants Trump's and DOGE's direction, NSF has taken aim at

the pillars sustaining the United States' STEM preeminence. These actions violate the law

and jeopardize America's longstanding global leadership in STEM. NSF has announced

that it will no longer abide by Congress's longstanding mandates.

75.    Since the Trump Administration took office in January 2025, the NSF has

terminated more than a billion dollars in scientific grants that had previously been approved and

awarded through the merit review process and which the NSF was legally obligated to provide.

NSF has also returned without funding a steadily increasing number of proposals that were

recommended for funding. The pace of the terminations has escalated rapidly since mid-April, as

the Trump Administration has taken a wrecking ball to the NSF. During that brief time period,

more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105]

The grant terminations were generally not preceded by warnings, and thus came as a complete

shock to the researchers whose livelihoods and life's work depended on them.

76.    The grant terminations and return of proposals have typically been

conveyed in short, standardized missives containing boilerplate statements such as the one we

- 25 -

1    received from Defendant Lee Zia who was not a Cognizant Project Officer. Zia also indicated he

2    was sending the email on behalf of L. Hargraves who, at the time he sent us the email, was no

3    longer at NSF.

4            Your proposal was received by the agency. I regret to inform you
5        that the U.S. National Science Foundation (NSF) is not considering your
6        proposal referenced above for funding.
7            NSF has determined that it does not effectuate NSF program goals or
8        agency priorities. Please see the  Update on NSF priorities  webpage for
9        further information. If NSF received any reviews on your proposal, those
10        reviews are available to you in Research.gov. Any such reviews were not
11        considered in the agency's decision to return your proposal.
12            If you would like further information concerning this action, please
13        review the  NSF Proposal & Award Policies & Procedure Guide Chapter
14        IV.B , the FAQ found on the  Update on NSF priorities  webpage, or
15        contact the cognizant official whose name and e-mail address are
16        provided below..

18    77. We responded to this email by requesting a reconsideration as described in the PAPPG.

19        On June 14, 2025 we started the application for a reconsideration of our proposal. We

20        sent an email to Defendant Lea McAlister-Shields requesting that she tells us exactly

21        which priorities of the NSF our proposal did not effectuate. McAllister did not answer our

22        question as to which agency priority which we did not effectuate. The only information

23        she gave us was that our proposal was returned without review. That was a false

24        statement as our proposal had been positively reviewed before it was returned to us.

25        Defendant McAlister also informed us that the next step in the reconsideration process is

26        that we contact defendant James Moore and we did so on July 14, 2025. According to the

27        PAPPG regulations Moore was supposed to give us a response within 45 days. We

28        contacted him after 53 days and reminded him that he had not responded to our

29        reconsideration request. He never responded. His lack of response was in clear breach of

30        the PAPPG regulation.

31    78. In an apparent attempt to justify its new war on science, the NSF published a "Statement

32        of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create

33        opportunities for all Americans everywhere" and "[r]esearch projects with more narrow

34        impact limited to subgroups of people based on protected class or characteristics do not

35        effectuate NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

notices *en masse* to research projects, including many designed to implement Congress's express goals of increasing STEM participation by STEM underrepresented communities.

79.  NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI)."

80.  The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its 37 research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*, "This is not reform. It is a dismantling."[107]

81.  It appears that DOGE is behind the unlawful grant terminations at NSF. *See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine *Science* reported that all new research grants by the agency had been frozen, as ordered by the Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told *Nature*.").

82.  Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to *Time Magazine*, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications which had been systematically vetted by layers of subject matter experts. Our

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   closed-to-the-public deliberations were observed by Zachary Terrell from the DOGE

2   team. Through his Zoom screen, Terrell showed more interest in his water bottle and his

3   cuticles than in the discussion."[108]

4      83.   These grant terminations and return of meritorious proposals are a

5   disaster for the future of science in the United States. The gravity of the situation and

6   illegality of the grant terminations were summarized in a letter from the House of

7   Representatives' Committee on Science, Space, and Technology sent to the acting director of

8   the NSF, Brian Stone, on May 8, 2025. The letter characterizes the Trump Administration's

9   actions against the NSF as "chaos and destruction," and states that "[DOGE's] accusation that

10  these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement

11  from the agency declaring that the award "reflects NSF's statutory mission and has been

12  deemed worthy of support through evaluation using the Foundation's intellectual merit and

13  broader impacts review criteria.'"[109]

14     The chaos and destruction was also evident in the extent to which NSF actions in this matter have

15  been blatantly and egregiously in breach of the PAPPG in many ways. The Cognizant Program Officer

16  (CPO) had illegally removed Proposal 2500795 from the list of proposals awaiting decisions on

17  research.gov. The proposal was only placed back on the list after PI Norman raised the matter online.

18  Despite repeated requests, the CPO has yet to tell us which specific NSF priority our proposal does not

19  effectuate. Chapters 2b and 4.1 of the PAPPG outline specific reasons, but we have not yet been told which

20  requirements or new priorities we have breached.

21     84.   The House Committee Letter goes on to state: "The cancelation of

22  these awards suggests instead that NSF is willing to apply political censorship of awards

23  under direction from President Trump and the DOGE teenagers, which is a clear violation

24  of the statutory mission of the agency." *Id*. It then provides a few examples of recently

25  terminated grants to illustrate the folly, harmfulness, and in some instances absurdity of

26  the Trump Administration's grant cancellations. [109] Letter from House of Representatives'

27  Committee on Science, Space and Technology to Brian Stone (May 8, 2025),

28  https://democrats-science.house.gov/imo/media/doc/2025-05-

29  08%20Letter%20to%20Acting%20Director%20Stone.pdf.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations

85. Plaintiff Norman and others have long relied on NSF grants to fund meritorious projects aimed at advancing scientific knowledge. The termination of previously approved grants and proposals has caused and continues to cause Plaintiff and others serious harm.

86. On October 10, 2024, together with his collaborators at Iowa State University, Norman submitted (through the research non-profit STEMLIFE) a proposal to the National Science Foundation Program NSF 22-634, Racial Equity in STEM Education (RESTEM), which aims to support groundbreaking projects that contribute to advancing racial equity in STEM education and workforce development. Major consequences include the following:

a. Expenditure of considerable time and effort to find substitute funding;
b. Reputational injury, including loss of trust from the community partners so integral to ensuring that STEMLIFE public research is responsive and relevant to local needs.

87. These direct, concrete injuries to Plaintiff researchers themselves have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams; on the research mission of all institutions; on the residents of Maryland; and on all Americans, and indeed people throughout the world, who daily benefit from the fruits of research discoveries, innovations, and interventions.

## CLAIMS FOR RELIEF

### COUNT I –
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers

88. Plaintiff realleges all paragraphs above as if fully set forth herein.

89. This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

90. The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. The "Take Care Clause" assures that, consistent with the structural and functional separation of

- 29 -

1  powers on which our system of government is based—and on which it depends—"Congress makes the laws

2  and the President faithfully... executes them." *Utility Air Reg. Grp. v. Envtl. Prto. Agency*, 573 U.S. 302, 327

3  (2014) (cleaned up). The faithfulness the Constitution requires of the Executive is not to the President's views

4  on priorities, but to the laws enacted by Congress as interpreted and enforced by the Courts. Congress's

5  powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution

6  "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v.*

7  *Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

8  Accordingly, Defendants' actions should be declared unconstitutional and enjoined.

9

## COUNT II –
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
### Violation of First Amendment (Content and Viewpoint Discrimination)

13  91. Plaintiffs reallege all paragraphs above as if fully set forth herein. powers on which our

14      system of government is based—and on which it depends—"Congress makes the laws

15      and the President faithfully... executes them." *Utility Air Reg. Grp. v. Envtl. Prto. Agency*,

16      573 U.S. 302, 327 (2014) (cleaned up). The faithfulness the Constitution requires of the

17      Executive is not to the President's views on priorities, but to the laws enacted by

18      Congress as interpreted and enforced by the Courts. Congress's powers to set the policies

19      of the nation are at their apex when it comes to spending money, as the Constitution

20      "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of*

21      *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

22  II.  92. The executive branch has no constitutional authority to refuse to carry out laws

23      enacted by Congress, and it has no constitutional authority to block, amend, subvert, or

24      delay spending appropriations based on the President's own policy preferences. For nearly

25      two hundred years, it has been established that a president violates the Take Care Clause

26      when he overrides statutes enacted by Congress, or refuses to execute such statutes or

27      their implementing regulations. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613

28      (1838). The President "is without authority to set aside congressional legislation by

29      executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C.

30      Cir. 1999).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

III.    93. Defendants' decisions to unilaterally return grant proposals duly recommended for funding and withhold funding that Congress has appropriated precisely to fund such grants violates the separation of powers.

IV.    94. Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

V.    95. Because Defendants' actions violate the separation of powers and are *ultra vires*, they should be declared unconstitutional and enjoined. The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

VI.    96. The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

VII.    97. "[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in original)). In the grant-making context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL 1009026, at 12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

VIII.    98. Defendants' mass termination of grants and meritorious proposals to disadvantage or promote particular political and ideological viewpoints is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the marketplace of ideas, Defendants terminated many grants and meritorious proposals based on the recipients' (presumed) viewpoint as reflected in the subject matter of their research. This is most evident in the Termination Notices' citation to Executive Orders purporting to combat "Radical Indoctrination" and "Radical . . . DEI Programs," and to further

- 31 -

"Biological Truth." The Termination Notices make plain that Defendants believe that the content

of Plaintiffs' speech conflicts with the Administration's views, and Plaintiffs' grants were

terminated at least in part for this reason. The First Amendment does not tolerate such viewpoint

discrimination.

IX.   99. Accordingly, Defendants' actions are not in accordance with

law and are contrary to constitutional right or power.

X.    100. The First Amendment provides that the federal government "shall

make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

XI.    101. The First Amendment prohibits the government from "regulating

speech when the specific motivating ideology or the opinion or perspective of the speaker is the

rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829

(1995). "Discrimination against speech because of its message is presumed to be

unconstitutional." *Id.* at 828.

XII.    102. "[E]ven in the provision of subsidies, the Government may not

'ai[m]at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S.

569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550

(1983) (alteration in original)). In the grant-making context, the government may not reject "a

whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a

disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace."

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL

1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

XIII.    104. Defendants' mass termination of grants and meritorious proposals to

disadvantage or promote particular political and ideological viewpoints is "the product of

invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they

disfavored out of the marketplace of ideas, Defendants terminated many grants/proposals  based

on the recipients' (presumed) viewpoint as reflected in the subject matter of their research. This

is most evident in the Termination Notices' citation to Executive Orders purporting to combat

"Radical Indoctrination" and "Radical . . . DEI Programs," and to further "Biological Truth."

The Termination Notices make plain that Defendants believe that the content of Plaintiffs'

speech conflicts with the Administration's views, and Plaintiffs' grants were terminated at least

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

in part for this reason. The First Amendment does not tolerate such viewpoint discrimination.

XIV. 105. Accordingly, Defendants' actions are not in accordance with law and are contrary to constitutional right or power and should be enjoined.

**COUNT III –**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process / Void for Vagueness)**

I.   106. Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

II.   107. The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before the deprivation of a constitutionally protected interest.

III.   108. Plaintiffs have a constitutionally protected property interest in grant funding that supports their salaries and stipends, as well as their ongoing research. Plaintiffs have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, in hiring staff, in making commitments to research partners, and in many other ways. Plaintiffs also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

IV.   109. Defendants' cancellation or imminent cancellation of federal grant/proposals funding does not provide Plaintiffs fair notice or a reasonable opportunity to be heard. When Plaintiff Norman requested a reconsideration and complied fully with the reconsideration process set forth in the PAPPG regulations, Defendants did not follow the regulations and never responded to Plaintiff's request as required per the PAPPG.,

V.   110. The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

VI.   111. Because of the vagueness in the language of Defendant Trump's Orders and the Federal Agency Defendants' chaotic efforts to give effect to those Orders, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, and what the demographics of study participants must be. This

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    makes it impossible to determine how to reconfigure future research to stay within the bounds

2    of the agencies' newest "priorities."

3    112. Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls accordingly

4    violates the Due Process Clause. Accordingly, Defendants' actions are not in accordance with law and

5    are contrary to constitutional right or power. Defendants' actions constitute impermissible viewpoint

6    discrimination and must be set aside.

7                        VII.

8

9                                    **COUNT IV –**

10   **Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law;**

11   **Illegal Departure from Impoundment Control Act, Statutes, and**

12                                **Regulations**

13

14           VIII.   113. Plaintiffs reallege all paragraphs above as if fully set forth herein.

15                IX.   114. The APA directs courts to "hold unlawful and set aside agency

16           actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of

17           discretion, or otherwise not in accordance with law … [or] in excess of statutory

18           jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §

19           706(2)(A),(C). Defendants' actions violate these provisions, calling on the Court to hold

20           them unlawful and set them aside for several reasons, including those specified below.

21                X.   115. First, by refusing to spend money that Congress appropriated,

22   Defendants are violating the Congressional Budget and Impoundment Control Act of 1974 (ICA),

23   and the appropriations statutes underlying each agency's funding scheme. Under the ICA, a

24   "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated

25   funds, as well as "any other type of Executive action or inaction which effectively precludes the

26   obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the executive branch

27   wishes to defer funds, it must send a special message to Congress detailing the money to be

28   deferred and the reasons for deferral. There are only three permissible grounds for deferrals, *id.* §

29   684(b), none of which includes effort to ensure funds are spent consistent with the President's

30   new policy priorities.

31                XI.   116. Defendants' actions constitute a "deferral" because they reflect

32           a "withholding or delaying [of] the obligation or expenditure of" funds that Congress

33           appropriated. Defendants did not notify Congress of the deferrals as the ICA requires, nor

34           did Defendants undertake the deferrals for reasons the ICA permits.

- 34 -

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

XII.  117. Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for agency action, including grant-making. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

XIII.  118. Second, Defendants are violating the agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies. The work that Plaintiff and colleagues were recommended for funding to perform furthers agency missions and fulfills specific statutory requirements set by Congress. Withholding the appropriated funds contradicts Congress's directives.

119. Third, where proposals recommended for funding were issued in accordance with agency-specific rules but not funded for reasons inconsistent with those rules, Defendants are violating their own regulations and agreements as evidenced by their arbitrary and capricious actions. Defendants' actions must be set aside under the APA and related statutes.

## COUNT V –
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making

XV.  120. Plaintiffs reallege all paragraphs above as if fully set forth herein.

XVI.  121. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.§ 706(2)(A). Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Agency action is therefore lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). This principle applies *a fortiori* to agency departures from long settled policy. *Id.*

XVII.  122. Further, agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    evidence before the agency, or is so implausible that it could not be ascribed to a difference in

2    view or the product of agency expertise." *Id.* Agency action is also arbitrary and capricious if,

3    when departing from a prior policy, an agency does not "display awareness that it *is* changing

4    position" or does not "show that there are good reasons for the new policy." *FCC v. Fox*

5    *Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

6

7                    XVIII.        123. Defendants' mass return of proposals recommended

8            for funding was arbitrary and capricious for many reasons, including (but not limited

9            to) the following:

10                   The Termination Notices do not provide a reasoned explanation for reasons why

11                   meritorious proposals were returned unfunded. Rather, the letters generally state

12                   that the proposals were  being retuned on account of not "effectuating" Agency

13                   priorities. That generic statement is not a reasoned explanation.

14    124. Research proposals are recommended for funding only after a rigorous and objective

15    application and review process that necessarily established that projects recommended for funding

16    were meritorious and satisfied relevant criteria. Defendants have failed to provide any reason our

17    proposal failed to satisfy applicable criteria. The reason that NSF cites for returning our proposal is

18    false. The NSF statement that our proposal was being returned without review (RWR) is an

19    outright falsehood. The proposal had been reviewed and found to be 'good and competitive' by all

20    three expert reviewers. Nowhere in the PAPPG is allowance made for returning a proposal without

21    review after the proposal had been reviewed and recommended for funding. Under the

22    Administrative Procedures Act (APA), NSF is bound by law to act in compliance with its own

23    stated PAPPG. The false statement by NSF is therefore also in clear breach of the PAPPG. Our

24    proposal was returned after a full review, which confirmed it met NSF priorities, the solicitation

25    requirements, and standards for intellectual merit and broad impact. The expert reviews were

26    preceded by an initial determination of compliance and appropriateness by NSF staff and

27    accompanied by further staff scrutiny for appropriateness and compliance during the expert review

28    stage. Proposals are not sent for expert review without prior and concurrent determination by NSF

COMPLAINT FOR
                                                DECLARATORY AND INJUNCTIVE RELIEF

Case        Document 1   10/15/2025   Page 37 of 39

staff that the proposals effectuate NSF priorities.

125. Defendants likewise failed to consider the significant consequences grant termination will have on the individuals and organizations involved in conducting research, the durability of the institutions in which they work, and on the broader public that will be deprived of benefits meant to accrue from the work accomplished with the grant funding.

XIX. 126. Defendants have failed to adequately justify their actions; have not considered the substantial reliance interests at stake; have relied on factors that Congress did not authorize them to consider; and have not acknowledged or justified their change from prior agency positions.

XX. 127. In sending standardized termination letters to terminate or block grants *en masse*, Defendants failed to "examine 'the relevant data' and articulate 'a satisfactory explanation' for [their] decision, 'including a rational connection between the facts found and the choice made,'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43). The return of our meritorious proposal recommended for funding must be set aside under the APA as arbitrary and capricious.

## **PRAYER FOR RELIEF**

128. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiff and award Plaintiff and his collaborators the following:

A. 129. Declare as unlawful and set aside Defendants' unfunded return of our meritorious proposal recommended for funding as arbitrary and capricious. Declare the email Notices that returned as unfunded, meritorious proposals previously recommended for funding, as violative of the Constitutional separation of powers; the First and Fifth Amendment protections of free speech and due process; the Impoundment Control Act; agency-specific statutes and regulations, including congressional directives and appropriations acts; and the Administrative Procedure Act;

A. 130. Declare as ultra vires Defendants' decisions and implementation of the return of proposals recommended for funding. Grant preliminary and ultimately final injunctive relief to enjoin

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Defendants from cutting off agency and grantee access to congressionally appropriated funding,

2    from giving effect to the violative return of meritorious proposals recommended for funding, or

3    undertaking any similar violative action to terminate additional duly awarded or recommended

4    for funding agency grants; to restore such previously awarded grants; to require Defendants to

5    provide no-cost extensions to grantees for the time necessary to resume and complete interrupted

6    work; and to return to the lawful and orderly grant procedures they employed prior to January

7    20, 2025 in terms of which our meritorious proposal that was recommended for funding will be

8    funded fully without delay.

9          B.    131. Award Plaintiffs and counsel reasonable costs and attorneys' fees;

10    and

11          C.    132. Issue such other relief as the Court deems just and proper.

12
13    D.    Our case at bar is indistinguishable from Thakur et al v. Trump et al | United States District Court,

14    Northern District of California (case # 3:25-cv-04737-RFL). Plaintiffs in that case prevailed on their

15    motion for injunctive relief and the 9th Circuit in a published opinion THAKUR V. TRUMP, No. 25-

16    4249 (9th Cir. 2025) affirmed the lower federal court order. Accordingly our prayer to this court rests on

17    firm case law and should be granted,

18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33

# Certification and closing

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint; (1) is not being presented for an improper purpose, such as to harass, course, unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law, or buy a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of rule 11.

### For Pro Se Parties

I agree to provide the Clerk's office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's office, may result in the dismissal of my case.

Date of signing: October 14, 2025

Signature of plaintiff:    /s/ Obed Norman

Telephone: 4436481028

Email: onorman6@gmail.com

Printed name of plaintiff: Obed Norman

Address:
3010 St Paul Street
Apt 2
Baltimore MD 21218

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, I served a copy of the foregoing Complaint for Declaratory and Injunctive Relief on all Defendants by certified mail to their official addresses as required by law.